IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| NYDIA TISDALE, | * | |
| | * | |
|     Plaintiff, | * | CIVIL ACTION |
| | * | NO. 2:12-CV-00145-RWS |
| v. | * | |
| | * | |
| MAYOR H. FORD GRAVITT, | * | |
| individually and in his official capacity, | * | |
| CITY OF CUMMING, GEORGIA and | * | |
| POLICE CHIEF CASEY TATUM, | * | |
| individually and in his official capacity | * | |
| as Chief of Police for the City of | * | |
| Cumming, DEPUTY POLICE CHIEF | * | |
| WALTER COOK, individually, | * | |
| | * | |
|     Defendants. | * | |
| | * | |

## PLAINTIFF'S BRIEF IN SUPPORT OF PARTIAL SUMMARY JUDGMENT ON FIRST AND FOURTH AMENDMENT AND OPEN MEETING ACT CLAIMS AGAINST ALL DEFENDANTS

Plaintiff, Nydia Tisdale (Tisdale) seeks partial summary judgment as to liability regarding the following claims as to each defendant raised in this lawsuit:

(1) Liability for damages for clearly established violations of the First Amendment;

(2) Liability for damages for clearly established violations of the Fourth Amendment; and

(3) Liability for civil penalties for violations of the Georgia Open Meetings Act.

Undisputed evidence shows that Defendants detained and seized Tisdale and her filming equipment and prevented her from filming – admittedly without any legal justification and for the sole reason of stopping the filming of a public meeting. As there is no material factual dispute that Plaintiff was prevented from filming and she and her camera were seized without legal justification, Tisdale seeks partial summary judgment on liability on constitutional claims – leaving to the jury only the question of the amount and type of damages. *See generally Jackson v. Sauls*, 206 F.3d 1156, 1167 (11th Cir. 2000). Moreover, Tisdale is entitled to civil penalties under the Georgia Open Meetings Act.

## STATEMENT OF FACTS

Nydia Tisdale is a college and graduate school-educated citizen journalist who frequently videotapes public meetings and court hearings of public interest throughout the State of Georgia. *P SUMF* ¶ 1. Ms. Tisdale is the owner and administrator of AboutForsyth.com, which covers topics of public interest in Forsyth County. She films meetings and court hearings so that others who are unable to attend these proceedings are able to watch and understand them. She posts her videotapes to YouTube for others to view them and follow what their government is doing. *P SUMF* ¶ 2.

Ms. Tisdale attended the April 17, 2012 meeting of the Cumming City Council because she was interested in an intergovernmental agreement between the City of Cumming and Forsyth County regarding their water contracts for raw and finished water. *P SUMF* ¶ 3. Ms. Tisdale arrived at the April 17, 2012 meeting, and notified the City Attorney Dana B. Miles that some citizens were standing outside of the building and could not get in to the meeting because the doors were locked. *P SUMF* ¶ 4.

As soon as the April 17, 2012 Cumming City Council meeting began,[1] Mayor Ford Gravitt asked the police chief to remove Ms. Tisdale's video camera from the auditorium, stating:

> First of all, a little house cleaning. Uh, Chief Tatum, if you would, remove the camera from ... from the auditorium. We don't allow filming inside of the city hall here unless it's specific reasons, so if you would remove the camera.

*P SUMF* ¶ 5. Tisdale attempted to assert her right to film stating "Respectfully Mayor ..." and explained that Georgia law permitted videotaping of meetings. She thrice requested that the City Attorney in attendance, Dana B. Miles, be

---

[1] Many of the events were captured on Tisdale's video and the video recorded by the City of Cumming. The parties have stipulated as to the admissibility of these videos which can be viewed at:
http://www.youtube.com/watch?v=vaulDwK6ou0
http://www.youtube.com/watch?v=Vs1sOg8HXws

consulted. *P SUMF* ¶ 6. *See* O.C.G.A. § 50-14-1(c)("Visual and sound recording during open meetings shall be permitted"). Mayor Gravitt responded that removal of the camera was not up for discussion. *P SUMF* ¶ 7.

Police Chief Tatum, wearing his law enforcement uniform, badge, and gun, approached Ms. Tisdale, and grabbed her tripod, as well as Ms. Tisdale's arm with his left hand. *P SUMF* ¶ 9. At the time Chief Tatum grabbed the tripod, Ms. Tisdale grabbed the tripod as well. *P SUMF* ¶ 10. Throughout this interaction, Ms. Tisdale attempted to explain to the Mayor that she was exercising her right as a citizen to film public meetings. *P SUMF* ¶ 11.

According to another Cumming police officer, Daniel Hesters, the action transpired as follows:

> She [Tisdale] was – at that time she was trying to explain to the mayor her case for staying. And the chief had his hand on her back at the time. And then it, as he reinforced for her to exit, Chief – at this time, Chief Cook was grabbing her camera as well, during all the – the movement there. That's Assistant Chief Cook escorting the camera out. *P SUMF* ¶12.

> At first, it was a, you know, slowing kind of move out issue. And then as she was explaining, then he went hands on with her arm as a compliant to move. *P SUMF* ¶ 13.

> She was trying to plea her case, so she was moving around. And that's when he actually grabbed her arm and was her, let's go. *P SUMF* ¶ 14.

Police Chief Tatum has since conceded that there was going to be no recording

that night. *P SUMF* ¶ 8.

Another officer, Deputy Police Chief Cook, assisted Chief Tatum in removing Ms. Tisdale from the auditorium. *P SUMF* ¶ 15. Deputy Police Chief Cook grabbed Ms. Tisdale's other arm. *P SUMF* ¶ 16.

Both officers escorted Ms. Tisdale to the back of the room close to the entrance of the meeting room. *P SUMF* ¶ 17. They then escorted Ms. Tisdale out of the meeting portion of the room. *P SUMF* ¶ 18. Police Chief Tatum asked Ms. Tisdale to step outside of the meeting room four times, and Ms Tisdale did not leave the meeting area voluntarily. *P SUMF* ¶ 19. In sum according to multiple witnesses:

> As a practical matter, the tripod, the camera, and Ms. Tisdale exited the room – right – together? Yes.

*P SUMF* ¶ 20.

Both officers applied considerable pressure to Ms. Tisdale's arms and hurt her. *P SUMF* ¶ 21. Police Chief Tatum's hand was on Ms. Tisdale's arm for about two minutes. *P SUMF* ¶ 22. Ms. Tisdale repeatedly asked the officers to let her go. *P SUMF* ¶ 23-24 ("[Tisdale] started yelling don't touch me, don't touch me… "). Witness Nahed described the touching as follows: "I got a picture of the guy manhandling...." *P SUMF* ¶ 24.

When Ms. Tisdale realized that she was not going to be allowed to exercise

her right to film the meeting, she reluctantly put her camera away.   *P SUMF* ¶ 25. The third officer, Daniel Hesters, followed and brought Ms. Tisdale's camera bag to her.   *P SUMF* ¶ 26.

Ms. Tisdale then exited the main room into the hall way area and began to make some phone calls.   As one witness put it:

> … I do remember that that she was completely out of all the chambers at one point.   She was not there at all.   Q: Does that make sense?   But that was not because Chief Tatum escorted her out of the room?   A: It was because of that.   She was taken out of the room. Okay.   Like she wasn't in the room after Chief Tatum removed her from there.   *P SUMF* ¶ 27

In fact, Ms. Tisdale called the Forsyth County Attorney, Ken Jarrard, to locate the number of the Attorney General's Office.   *P SUMF* ¶ 28.   Ms. Tisdale was "trembling," when she told Mr. Jarrard that "she had just been removed from city hall for trying to video the meeting."   *P SUMF* ¶ 29.

Ms. Tisdale eventually returned to the public meeting room, and began to video the meeting with a smaller camera. Deputy Police Chief Cook again ordered her to stop using the smaller video camera and to stop recording.   *P SUMF* ¶ 30.

Prior to the incident, neither the Mayor, Police Chief Tatum, or Deputy Police Chief Cook ever had any training on the Georgia Open Meetings Act and its requirements.   *P SUMF* ¶ 31.   Mayor Gravitt initially denied that he had

violated any laws saying "it was the right thing to do." *P SUMF* ¶ 32. http://www.youtube.com/watch?v=3EPmGpkGgUE  However, all defendants have apparently now conceded in litigation that the Open Meetings Act allows audio-visual recording.  *P SUMF* ¶ 33.  Mayor Gravitt now apparently concedes that he was wrong in making the decision to remove Ms. Tisdale and her camera from the meeting.  *P SUMF* ¶ 34.  He also admits that the City of Cumming has been admonished about the incident by the State's Attorney General, though the City refuses to settle the lawsuit filed by that office.  *P SUMF* ¶ 35.

After review of the videotape of the meeting, Police Chief Tatum believes that Ms. Tisdale was not violating any law at the time he seized her camera. Chief Tatum also concedes that he does not know if he had probable cause to remove Ms. Tisdale from the meeting when he did so.  *P SUMF* ¶ 36. Both Police Chief Tatum and Deputy Police Chief Cook think Ms. Tisdale has the right to record the public meeting. *P SUMF* ¶ 37.

The City has since developed a new policy on videotaping public meetings. *P SUMF* ¶38.

Ms. Tisdale was and is terrified, humiliated and distressed because of the incident.  The City violated her right to film a public meeting, violated and seized her person for no reason, and violated her property rights when it seized

her tripod and camera.   Ms. Tisdale was humiliated by being removed from the meeting when she did nothing wrong, and was embarrassed in front of all the other attendees at the meeting. Ms. Tisdale was afraid of what might happen to her when two armed police officers grabbed her.   She was afraid because she did not know where the police officers would take her when they led her out of the meeting room, and afraid of what might happen to her if she did not obey the police officers' commands.   Ms. Tisdale did not know whether they would handcuff her, put her in a patrol car, or take her to jail.   Ms. Tisdale felt like she was a criminal, like she had done something wrong, even though she was just exercising her rights as a citizen.   She continues to be embarrassed and humiliated to this day.   The whole experience was very unsettling and disturbing to Ms. Tisdale, and she will never forget it.   *P SUMF* ¶ 39-49.

## ARGUMENT AND CITATIONS OF AUTHORITY

As there is no material factual dispute that Tisdale was prevented from filming, and that she and her camera were seized without legal justification for doing so, Tisdale seeks partial summary judgment as to liability on First and Fourth Amendment and Georgia Open Meetings Act claims.

I.　　　**DEFENDANTS VIOLATED TISDALE'S FIRST AND FOURTH AMENDMENT RIGHT TO FILM BY PREVENTING FILMING AND SEIZING TISDALE AND HER CAMERA**

The Eleventh Circuit has clearly held that citizens have a First Amendment right to gather information and monitor government activity in public places including government meetings.   Likewise, the Eleventh Circuit has specifically and clearly held that seizure of citizens and their property for filming violates the Fourth Amendment. Finally, O.C.G.A. § 50-14-1(c) provides: "Visual and sound recording during open meetings shall be permitted." Because there is no dispute that Tisdale was prevented from filming by final order of Mayor Gravitt, defendants violated clearly established constitutional and state law.[2]   Indeed, one of the main cases in this Circuit arises out of the conduct of the exact same defendant here: City of Cumming, Georgia.

### A.　　　First Amendment Right to Film Public Meetings

Eleventh Circuit case law clearly establishes a First Amendment right to film public meetings, and the blanket order barring such filming violated Tisdale's rights.

---

[2]　　Of course, as to Defendant City of Cumming, qualified immunity does not apply.   There is no question that Mayor Gravitt was the final policymaker for filming, and issued an order to stop filming.   *Pembauer v. City of Cincinnati*, 475 U.S. 469, 482   (1986).   Gravitt, the Police Chief and other councilman testified that Gravitt solely set the policy to disallow video cameras and made the decision as to Tisdale.   *P SUMF* ¶ 5.

In *WSB-TV v. Lee*, a reporter was investigating allegations that the Douglas County Sheriff was using inmates to build a barn on his own property. 842 F.2d 1266 (11th Cir. 1988). When the WSB cameraman and reporter sought to interview the sheriff, and began taping and questioning him, the sheriff "pulled the microphone from the camera and pushed the camera and [cameraman] down toward the ground." *Id.* at 1268. This Circuit reversed a grant of summary judgment to the Sheriff and held that a "reasonable inference" could be drawn that there was an "effort of defendant to thwart or impede plaintiffs in gathering and reporting news relating to the sheriff's use of inmate labor on his private property, an interference with the plaintiffs' first amendment rights...." *Id.* at 1270. The panel similarly held that a citizen has a "First Amendment right, subject to reasonable time, place and manner restrictions, to photograph or videotape police conduct." [3] Subsequently, the Eleventh Circuit addressed **a case involving the same defendant here, City of Cumming, Georgia at a time when Mayor Gravitt then too served as mayor**. *Smith v. City of Cumming*, 212

---

[3]      *Accord Fordyc v. City of Seattle*, 55 F3d 436, 439-442 (9th Cir. 1995) ("First Amendment right to film"); *Abella v. Smith*, 522 Fed. Appx. 872, 874 (11th Cir. 2013) (same); *see also Ortiz v. City of New York*, 2013 WESTLAW 5339156, *3 (S.D.N.Y. 2013) ("[T]his Court is inclined to agree with the First, Seventh, Eleventh, and Ninth Circuits that the photography and recording of police officers engaged in their official duties 'fits comfortably' within First Amendment principles .... Additionally, the United States Department of Justice has taken the position that the First Amendment protects the right to record ....") (citations omitted).

-10-

F.3d 1332, 1333 (11th Cir. 2000). This Circuit, citing the wall of authority on the issue, held:

> As to the First Amendment claim under Section 1983, we agree with the Smiths that they had a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct. The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest. *See Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir.1994) (finding that plaintiffs' interest in filming public meetings is protected by the First Amendment); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir.1995) (recognizing a "First Amendment right to film matters of public interest"); *Iacobucci v. Boulter*, No. CIV.A. 94-10531, 1997 WL 258494 (D.Mass, Mar. 26, 1997) (unpublished opinion) (finding that an independent reporter has a protected right under the First Amendment and state law to videotape public meetings); *see also United States v. Hastings*, 695 F.2d 1278, 1281 (11th Cir.1983) (finding that the press generally has no right to information superior to that of the general public) (citing *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 609, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)); *Lambert v. Polk County*, 723 F.Supp. 128, 133 (S.D.Iowa 1989) ("[I]t is not just news organizations ... who have First Amendment rights to make and display videotapes of events...."); *Thompson v. City of Clio*, 765 F.Supp. 1066, 1070-71 (M.D.Ala.1991) (finding that city council's ban on member's attempt to record proceedings regulated conduct protected by the First Amendment); *cf. Williamson v. Mills*, 65 F.3d 155 (11th Cir.1995) (reversing district court's grant of qualified immunity to a law enforcement officer who seized the film of and arrested a participant in a demonstration for photographing undercover officers). Thus, the district court erred in

concluding that there was no First Amendment right.[4]

As *Smith* notes, this Circuit had already specifically held that citizens' right to film includes recording government meetings. *Blackstone v. Alabama*, 30 F.3d 117, 120 (11th Cir. 1994) ("Judge Dorrough did not deny the plaintiffs access to the Committee meeting and its deliberations, and did not prohibit them from communicating what they observed to others. However, his attempt to prohibit them from recording the proceedings did have some impact on how they were able to obtain access to and present information about the Committee and its proceedings. Thus, Judge Dorrough's actions touched on expressive conduct protected by the Free Speech Clause of the First Amendment."); *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999) (filming public officials in the public area of a

---

[4]     *Channel 10, Inc. v. Gunnarson*, 337 F.Supp. 634, 636-37 (D. Minn 1972) (police demand and seizure of camera after reporter filmed burglary in public place was a "clear" violation of the Fourth Amendment and a "prior restraint" under the First Amendment); *Connell v. Town of Hudson*, 733 F.Supp. 465, 470-73 (D.N.H. 1990) (granting summary judgment and denying qualified immunity where officers interfered with "picture-taking activities" of reporter who did not obstruct  "police or emergency functions"); *Robinson v. Fetterman*, 378 F.Supp.2d 534, 542 (E.D. Pa. 2005) ("Having "no doubt" about the right to film "[v]ideotaping is a legitimate means of gathering information for public dissemination"); *Demarest v. Athhol/Orange Comm. TV, Inc.*, 188 F.Supp.2d 82, 94 (D. Mass. 2002) ("At base, plaintiffs had a constitutionally protected right to record matters of public interest"); *Davis v. Stratton*, 575 F.Supp.2d 410, 415 (N.D.N.Y 2008) (clear right to film); *Lambert v. Polk Cty., Iowa*; 723 F.Supp. 128, 133 (S.D. Iowa 1989) ("It is not just new organizations ... who have First Amendment rights to make and display videotapes of events – all of us ... have that right.").

public building was "done in the exercise of [Plaintiff's] First Amendment rights").

Most recently, the First Circuit recognized the clear First and Fourth Amendment rights to film and not have one's camera and person seized for doing so – denying qualified immunity as to both constitutional rights.  *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011).  First, the Circuit answered "unambiguously in the affirmative" that a citizen had the right to film public officials activities:

> It is firmly established that the First Amendment's aegis extends further than the text's proscription on laws "abridging the freedom of speech, or of the press," and encompasses a range of conduct related to the gathering and dissemination of information. ....
>
> In line with these [Supreme Court] principles, we have previously recognized that the videotaping of public officials is an exercise of First Amendment liberties. ....
>
> Our recognition that the First Amendment protects the filming of government officials in public spaces accords with the decisions of numerous circuit and district courts[citing *inter alia* Eleventh Circuit caselaw]. ....
>
> It is of no significance that the present case involves a private individual, and not a reporter, gathering information about public officials. The First Amendment right to gather news is, as the Court has often noted, not one that inures solely to the benefit of the news media; rather, the public's right of access to information is coextensive with that of the press..... Moreover, changes in technology and society have made

the lines between private citizen and journalist exceedingly difficult to draw. The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper. Such developments make clear why the news-gathering protections of the First Amendment cannot turn on professional credentials or status.

In summary, though not unqualified, a citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment. Accordingly, we hold that the district court did not err in denying qualified immunity to the appellants on Glik's First Amendment claim.   *Id.* at 82-85 (citations omitted)

*Accord ACLU of Ill. v. Alzarez*, 679 F.3d 583, 600-601 (7th Cir. 2012) (eavesdropping

statute "interferes with the gathering and dissemination of information about

government officials performing their duties in public") (discussing *Glik*); *Fordyce*

*v. City of Seattle*, 55 F.3d 436, 439-40 (9th Cir. 1995) (upholding a "First

Amendment right to film matters of public interest").

Thus, this Circuit, along with decisions across the country, has explicitly

held that blanket bars on filming public officials in public places violates the First

Amendment.   Mayor Gravitt ordered the police defendants to stop Tisdale's

filming, and the officers twice executed that order, in clear violation of the First

Amendment.   Tisdale is entitled to summary judgment as to liability on this claim.

### B.      Fourth Amendment Right Not to Have Cameras/Persons Seized While Filming

The seizure of Tisdale's camera, and her person, are both undisputed.[5] Likewise, it is undisputed that Tisdale had a right to film and was engaged in lawful activity for which there was no arguable probable cause of criminal activity.

The Eleventh Circuit has held that "[t]here are three broad categories of police-citizen encounters for purposes [of] Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *U.S. v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006).   In determining whether an encounter has risen to the level of a brief seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the

---

[5]      There is some dispute about the manner in which Tisdale was physically touched by the officer.   However, there is no dispute that she was touched, four times ordered by the police chief to stop filming and/or leave, that her camera was physically seized, and that she was prevented from filming twice and escorted out of the meeting area.   The manner of touching is not dispositive as to her personal seizure given other undisputed facts as set forth herein.

police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (citing *Michigan v. Chesternut*, 486 U.S. 567, 569 (1975)); *United States. v. Mendenhall*, 446 U.S. 544, 554 (1980).

A seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 (1968); *see also Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004) (magnetometer search violates Fourth Amendment). Whether the encounter is considered a seizure "turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage in a crime." *United States v. Acosta*, 363 F.3d 1141, 1144-45 (11th Cir. 2004). "A person cannot be punished for failing to obey a police order that is itself unconstitutional." *Wright v. Georgia*, 373 U.S. 284, 291-92 (1963).

*Williamson v. Mills*, 65 F.3d 155 (11th Cir. 1995) speaks to the Fourth Amendment issues herein. In *Williamson*, a member of Veterans for Peace was invited to attend an event to honor veterans of the Vietnam War. There were a number of undercover officers at the event – one of whom had been the target of death threats by a biker gang. *Id.* at 156. Gerald Williamson, of Veterans for Peace, was photographing persons who appeared to be "surveilling [his group] too closely" because he feared that they were members of a "subversive group."

He would later learn that he was in fact photographing undercover officers. Officer Mills noticed Williamson photographing Undercover Officer Pavan who was the subject of a death threat:

> Mills knew that a photograph of Pavan would enable the hit man to identify her.   He also was aware that photographs of other undercover officers are salable to organized crime groups, which use such photographs to detect undercover infiltration.   *Id.*

Mills then "stopped Williamson, flashed his laminated badge, and demanded the film from Williamson's camera."   Williamson refused, and was threatened with arrest.   When Williamson turned to leave, Mills grabbed him and handcuffed him.   Ultimately, after being taken into a police van and after further demands, Williamson provided the film to the officer.   *Id.* at 156-57.

Williamson filed suit, focusing on Fourth Amendment claims. The district court granted qualified immunity, but the Eleventh Circuit reversed, finding that even under the "stringent standards" for qualified immunity, "pre-existing law compels the conclusion that Mills arrested Williamson without probable cause." Like the present case:

> Taking photographs at a public event is a facially innocent act.   The mere fact that Williamson's photographs *could* have been used for unlawful activity – such as carrying out a death threat against [the undercover officer] – is not enough to establish even arguable probable cause for Williamson's arrest.... Because Mills lacked even arguable probable cause to

arrest Williamson, Mills is not entitled to qualified
immunity.... *Id.* at 158 (emphasis in original).

"What was fatally missing ... was a link" to any suspected criminal activity. *Id.;*

*Thorton v. City of Macon*, 132 F.3d 1395, 1399-1400 (11ᵗʰ Cir. 1998) ("It is clearly

established that an arrest made without probable cause violates the Fourth

Amendment") ("none of the officers suggest[ed] that [the Plaintiff] committed

any other crime.").

The First Circuit's decision in *Glik*, in addition to affirming the denial of

qualified immunity for filming under the First Amendment, reached a similar

result on the Fourth Amendment claim:

> The presence of probable cause was not even
> arguable here. The allegations of the complaint establish
> that Glik was openly recording the police officers and
> that they were aware of his surveillance. ... We thus
> agree with the district court that, at this stage in the
> litigation, the officers are not entitled to qualified
> immunity from Glik's Fourth Amendment claim.   655
> F.3d at 88.

The Eleventh Circuit again addressed government officials demanding

information gathered in a public place in *Childs v. Dekalb Cty.*, 286 Fed.Appx. 687

(11ᵗʰ Cir. 2008).   There, the plaintiffs, who were vegan protesters at a

Honeybaked Ham store, observed an undercover officer monitoring their protest.

The plaintiffs wrote down the tag information of the vehicle.   After their protest,

they were stopped by the undercover officer and another officer, who demanded the tag information. They refused, and were ultimately arrested for disorderly conduct. In addressing whether the initial seizure, to confiscate the tag information written on a piece of paper was unconstitutional, this Circuit held:

> Because the defendants admittedly did not have reasonable suspicion that the plaintiffs or the other occupants of the car had engaged in any criminal activity, the seizure violated the plaintiffs' Fourth Amendment rights. *It has been clearly established since the Supreme Court decided Terry* that an investigative stop—a seizure for Fourth Amendment purposes—performed without reasonable suspicion violates the Fourth Amendment. *Id.* at *8.

Under *Williamson, Thorton, Childs* and *Glik*, it is clearly established that the Fourth Amendment prevents seizing a person and their camera, not for illegal activity, but because they are gathering information in a public place. Since the undisputed facts show that Defendants seized Tisdale's camera and also her person by removing she and her camera from the meeting area, and that such seizure was not premised on any even arguable unlawful activity, she is entitled to summary judgment as to liability on this claim.

## C. <u>Open Meetings Act Right to Film Public Meetings</u>

Under the Georgia Open Meetings Act, O.C.G.A. § 50-14-1(b)(1) "all

meetings shall be open to the public."   Moreover, O.C.G.A. § 50-14-1(c) provides: "Visual and sound recording during open meetings shall be permitted."   As discussed above, Defendants unquestionably violated the Open Meetings Act both by twice barring recording and by removing Tisdale from an open and public meeting.   As such, each defendant is subject to civil penalties under O.C.G.A. § 50-14-6 for three acts violating the Open Meetings Act.

      **D.**    **Tisdale was Prevented from Filming and She and Her Camera Seized in Violation of the First and Fourth Amendments and the Georgia Open Meetings Act**

As the video of the April 17, 2012 meeting shows, Tisdale was not permitted to video and audio tape much of the meeting.   After calling the meeting to order, Mayor Gravitt issued an order to the Chief of Police Casey Tatum and other officers present:

> First of all, a little house cleaning.   Uh, Chief Tatum, if you would, remove the camera from ... from the auditorium.   We don't allow filming inside of the city hall here unless it's specific reasons, so if you would remove the camera.

http://www.youtube.com/watch?v=vaulDwK6ou0   Tisdale's camera was removed, and she was not permitted to film much of the meeting. The Defendants admit that they had no reason to believe that they were entitled to prevent filming or seize Tisdale's camera and her person.   She had violated no criminal law, and

was filming as permitted under Georgia law and the Constitution.

Mayor Gravitt unconditionally prevented filming and instructed the Chief of Police to stop it. The Chief and Assistant Chief do not even suggest that they detained and questioned Tisdale in relation to any crime. Because Tisdale was twice prevented from filming and she and her camera seized in violation of clearly established First and Fourth Amendment rights and the Open Meetings Act, Tisdale should be granted partial summary judgment as to liability and civil penalties and for nominal and other actual and punitive damages to be proven at trial. *See Bourgeois v. Peters*, 387 F.3d 1303, 1318 (11th Cir. 2004).

## <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiff requests that her motion for partial summary judgment be granted.

DATED: This the 10th day of January, 2014.

Respectfully submitted,

/s Gerald Weber
Gerald Weber
Georgia Bar No.: 744878

Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, Georgia 31107
(404) 522-0507/(404) 932-5845

/s Hollie Manheimer

Hollie Manheimer
Georgia Bar No. 468880

150 East Ponce de Leon Avenue
Suite 230
Decatur, Georgia 30030
(404) 377-0485

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically submitted the foregoing **PLAINTIFF'S BRIEF IN SUPPORT OF PARTIAL SUMMARY JUDGMENT ON FIRST AND FOURTH AMENDMENT AND OPEN MEETING ACT CLAIMS AGAINST ALL DEFENDANTS** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF.

Dana K. Maine dmaine@fmglaw.com
James M. Dervin jdervin@fmglaw.com
Freeman Mathis & Gary, LLP
100 Galleria Pkwy., Suite 1600
Atlanta, Georgia 30339-5948

Dana B. Miles dmiles@mphtlaw.com
Kevin J. Tallant ktallant@mphtlaw.com
202 Tribble Gap Road, Suite 200
Cumming, GA 30040-2540

DATED: This the 10th day of January, 2014.

/s Gerald Weber

_____
Gerald Weber